# United States Navy-Marine Corps Court of Criminal Appeals

————————————

**UNITED STATES**
Appellee

**v.**

**R. Bronson WATKINS**
Staff Sergeant (E-6), U.S. Marine Corps
Appellant

**No. 201700246**

Appeal from the United States Navy-Marine Corps Trial Judiciary.

Argued: 20 December 2018—Decided: 21 February 2019.

Military Judge:
Lieutenant Colonel Matthew J. Kent, USMC.

Sentence adjudged on 27 March 2017 by a general court-martial panel consisting of officer and enlisted members. Sentence approved by the convening authority: reduction to E-1, confinement for 5 years, and a dishonorable discharge.

For Appellant:
*Lieutenant Daniel E. Rosinski, JAGC, USN* (argued).

For Appellee:
*Lieutenant George R. Lewis, JAGC, USN* (argued);
*Major Kelli A. O'Neil, USMC* (on brief).

————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

————————————

Before WOODARD, FULTON, and CRISFIELD,
*Appellate Military Judges*

Senior Judge FULTON delivered the opinion of the Court, in which Chief Judge WOODARD and Judge CRISFIELD joined.

FULTON, Senior Judge:

A general court-martial convicted the appellant, contrary to his pleas, of two specifications of failure to obey a lawful order and one specification each of sexual abuse of a child and obstructing justice, in violation of Articles 92, 120b, and 134, Uniform Code of Military Justice (UCMJ).[1] The appellant's counsel raises seven assignments of error. We specified an additional issue, and we have combined and reordered the alleged errors as follows:

I.  The appellant's civilian defense counsel labored under an actual conflict of interest, and the military judge erroneously denied his motion to withdraw;

II. The military judge violated the appellant's right to be represented by counsel of his choice;

III. The military judge erred by admitting a forensic interview of the victim under the residual hearsay exception;

IV. The evidence that the appellant committed a lewd act upon his daughter is factually insufficient;

V.  The military judge's instructions on obstructing justice were erroneous, and the appellant's counsel were ineffective for failing to object to them;

VI. The evidence that the appellant obstructed justice is legally and factually insufficient;

VII. The convening authority's action fails to accurately reflect the findings of the appellant's court-martial.

The appellant raises two additional assignments of error personally under *United States v. Grostefon*,[2] which we have considered and find to be without merit.[3] We find that the convening authority's action does fail to accurately reflect the findings of the court-martial, and we order appropriate relief. Finding no other prejudicial error, we affirm.

---

[1] 10 U.S.C. §§ 892, 920b, and 934 (2016).

[2] 12 M.J. 431 (C.M.A. 1982).

[3] *See United States v. Clifton*, 35 M.J. 79, 81 (C.M.A. 1992).

## I. BACKGROUND

The appellant was convicted of sexually abusing his nine-year-old daughter, CKW, by touching her breasts and vaginal area with his hands. In January 2016 CKW told her mother (the appellant's wife), that the appellant had sexually abused her that evening. The appellant's wife began to cry and the appellant immediately left the home. He sent apologetic texts to his wife, saying that he deserved to die and that that CKW would be better off without him. We he returned home, his wife threatened him with divorce. He responded by putting his wife's prescription pain medication in his mouth and threatened to swallow it.

The appellant's wife immediately reported CKW's allegations to law enforcement. A social worker visited the home the next day and took reports from the appellant's wife and daughter. A few days later, a forensic interviewer interviewed CKW, and CKW reluctantly told the interviewer that her father had touched her inappropriately more than once. The appellant's command issued the appellant a military protective order directing him to have no contact with his family—an order the appellant repeatedly violated. Sometime after the forensic interview, the appellant's wife and daughter stopped cooperating with the government and attempted to avoid being served with subpoenas.

The appellant's theory at trial was that his daughter had found him looking at pornography on a computer and, worried that this might cause a problem in her parents' marriage, made up an allegation of sexual abuse so that her parents would have to talk to one another and not get divorced.

Additional facts necessary to the resolution of particular assignments of error are included in the discussion.

## II. DISCUSSION

### A. Conflict of Interest and Choice of Counsel

The appellant was represented by a civilian defense counsel, retired Marine Corps judge advocate Mr. W. After an angry off-the-record exchange between Mr. W and the Regional Trial Counsel, LtCol K, Mr. W moved to withdraw from the case and the appellant stated that he no longer wished to be represented by Mr. W. The military judge did not permit Mr. W to withdraw, and the appellant claims on appeal that Mr. W was encumbered by a conflict of interest. We specified the related issue of whether the military judge's denial of Mr. W's motion to withdraw violated the appellant's right to be represented by counsel of his choice. We conclude that Mr. W did not have a con-

flict of interest, and that the military judge did not erroneously deprive the appellant of his right to be represented by the counsel of his choice.

*1. Facts related to counsel issues*

Shortly after CKW's allegations were reported to law enforcement officials, the government referred charges to a general court-martial alleging that the appellant sexually abused CKW. The appellant was arraigned on 1 July 2016, and Mr. W entered his appearance on 12 July 2016. He asked for and received a short continuance. The military judge scheduled trial for 12 September 2016.

On 2 September 2016, CKW sent a letter to the government claiming that she had fabricated the allegations against her father. This prompted the government to file a number of motions, and the military judge continued the trial an additional day in order to litigate the motions. With trial approaching, the government went to great lengths to locate and subpoena the appellant's wife. On 6 September, seven days before the appellant's trial was to begin, the appellant's wife and two daughters vacated their on-base housing and moved into a hotel, where they stayed for four days while the government tried to locate them. Ignoring his military protective order, the appellant visited his family at the hotel. In spite of this contact with her husband days before his scheduled court-martial, the appellant's wife denied knowing that the appellant's trial was scheduled to start on 12 September. She also denied being aware of the government's attempts to contact her. Three days before the appellant's court-martial was to begin, the appellant's wife and children moved again. The appellant's wife, who was from Uganda, had a Ugandan friend whose family lived in a Los Angeles apartment. The appellant's wife and two daughters shared the apartment with this family.

At the motion session held on what was to have been the first day of trial, the government reported to the military judge that they could not locate the appellant's wife or CKW. An investigator had delivered subpoenas to the family's home, called, sent texts, and asked neighbors where the family might be. The investigator even attempted to serve the subpoena by text message, taking a picture of the subpoena and sending it to the appellant's wife's cell phone.

The investigator obtained the family's bank records and found that the appellant's wife had recently used a debit card to make a purchase at a San Diego bookstore. This purchase was significant to the investigator because the bookstore was "next door" to Mr. W's law office, and the purchase had

4

taken place on a day when the investigator believed that the appellant had been to the office to meet with Mr. W.[4]

The investigator also thought it significant that about $22,000 had recently been deposited into a bank account accessible to the appellant's wife. A neighbor had informed him that the appellant's wife had expressed an interest in returning to Africa if she could afford to. Arguing that the appellant's wife was actively trying to avoid service, the government moved for a writ of attachment.

The military judge agreed that the appellant's wife was avoiding service, but noted that a writ of attachment could not be issued until a witness who had been personally served failed to appear for trial. He found that service by cell phone text message did not meet the personal service requirement. The military judge therefore denied the government's motion for a writ of attachment.

In the face of the investigator's testimony concerning his law office, Mr. W took the opportunity, both on cross-examination and during argument, to address the suggestion that he was in any way to blame for the government's difficulty with serving the appellant's wife. He pointed out that he had only met the appellant's wife one time, and that that meeting took place at her on-base residence. He further stated that he rarely went to his office and usually met with clients on base. The trial counsel's interpretation was that while this evidence might implicate the appellant, he did not believe that it implicated Mr. W. And the military judge stated that he did not suspect that Mr. W was involved in any conspiracy to keep the appellant's wife beyond the government's reach.

Unable to produce the appellant's wife and CKW, the government moved for a continuance. The parties agreed to delay the trial for about four months, to January 2017.

Meanwhile, the appellant's wife had moved into her Ugandan friend's apartment three days before the appellant's scheduled court-martial, and she told her hosts that she and her daughters would be staying for one week. After the appellant's trial was continued from September to January, however, one week became four months. At least one adult in the host family understood that she was there to avoid a subpoena. During the continuance, the appellant repeatedly violated his military protective order by visiting his family.

---

[4] Appellate Exhibit (AE) XL at 13.

Eventually the investigators learned where the appellant's wife was staying and personally served her with a subpoena. Shortly thereafter, investigators learned that the appellant had been violating his military protective order. The government apprehended the appellant and searched his car and two cell phones. A search of the appellant's browser history revealed that the appellant had searched the internet using search terms such as "dodging being served a subpoena;" "If I avoid a subpoena but am aware they are trying;" and "if I avoid receiving a subpoena is that obstruction of justice." After the government investigator sent a text to the appellant's wife with the picture of the subpoena, the appellant searched "subpoena a witness via text."[5] The appellant had also been researching whether Uganda had an extradition treaty with the United States and how to tell if one is on the government's no-fly list. The government was also able to obtain a video recording of the appellant meeting his wife at the hotel where his family had stayed days before moving in with the Ugandan family. The government ordered the appellant into pretrial confinement, where he remained until trial.

Now in possession of evidence that the appellant had committed additional offenses, the government dismissed the appellant's original charges and preferred new ones reflecting both sexual abuse of CKW as well as violations of the military protective order and obstructing justice. The new charges were referred to a general court-martial.

Since the appellant's original charges had been dismissed, the appellant's wife no longer had to comply with the subpoena. About a week after being served in Los Angeles, the appellant's family moved yet again, this time to Mississippi to stay with the appellant's parents. Again a government investigator tracked them down and traveled to Mississippi to serve new subpoenas for the pretrial motions hearing and the trial on the merits.

At a motions hearing for the newly referred charges, the government returned to the subject of Mr. W's law office, and its proximity to the book store where the appellant's wife had used her debit card. The military judge asserted that the fact that the appellant's wife had been in a bookstore near Mr. W's office was not relevant, and ruled that neither government counsel nor testifying agents could refer to that fact. But the government insisted it was relevant because, "it is where the accused could have potentially met with [his wife] and in the same vicinity of where he did meet with her later."[6] The military judge asked if the government had any evidence that the appel-

---

[5] Prosecution Exhibit (PE) 10.

[6] Record at 183.

lant had been there at the same time. The government did not, and the military judge persisted in his ruling.

After the military judge maintained his ruling on this matter, the Regional Trial Counsel for Camp Pendleton, LtCol K, who was sitting behind the bar, told trial counsel to ask for a recess. When the military judge recessed the court, LtCol K began to argue with the civilian defense counsel. Mr. W insisted that he had not been at his office the day the appellant's wife had been at the book store. LtCol K told Mr. W, in a raised voice, that he "didn't care;" that "this whole thing is shady;" and that "this isn't over" or words to that effect.[7]

When court resumed, the parties litigated the government's search of the appellant's cell phones. The defense argued that government's search of the appellant's phone was too broad, and that government agents took too little care to ensure that the search did not intrude on communications between the appellant and his attorneys. The defense argued that the search had left attorney-client correspondence in the form of text messages in the government's possession.

The motions hearing and LtCol K's heated off-the-record discussion with Mr. W took place on a Thursday, with trial on the merits scheduled to begin the following Monday. On Sunday, Mr. W sent an email to the military judge informing him that he had doubts about his ability to represent the appellant. He wrote that "the Government's improper actions combined with LtCol [K's] threat toward me have placed me in a conflict posture. . . . I discussed this generally with SSgt Watkins today so that you can conduct a proper inquiry into this issue tomorrow."[8] Mr. W added that if he must withdraw, or if the appellant released him, "I plan to refund SSgt Watkins' entire fee so that he can quickly retain conflict-free counsel."[9]

On the morning of the first day scheduled for trial, Mr. W moved to withdraw. He stated that the government suspected him of wrongdoing, and that he therefore had an interest that was directly adverse to the appellant. He recalled LtCol K's "very loud" assertion that "'[t]his isn't over,' which in this business, can only mean one thing[,] . . . I will be the next guy that they are coming after."[10] The military judge asked if Mr. W understood this to mean that he thought that LtCol K intended "to pursue a bar complaint or an ethi-

---

[7] Record at 185, 249.

[8] Appellate Exhibit (AE) LXV.

[9] *Id.*

[10] Record at 238.

cal complaint or some other type of action against you, and that will shape the way in which you conduct the defense?"[11] Mr. W answered, "Yes, your Honor."[12] Aside from LtCol K's words, Mr. W argued that he had "been virtually treated like a co-conspirator."[13] Mr. W complained that "[the government] repeatedly brought up the references to my being involved in the obstruction allegation, the changing of the testimony. . . . I have gotten to the point now that—especially that the texts are in the . . . government's hands, where I think I have a direct conflict."[14]

After a lengthy recess, the military judge called LtCol K as a witness on the motion to withdraw. He asked him what he meant when he told Mr. W that it "wasn't over." LtCol K testified that he was referring to "where the last credit card transaction for the wife of the accused was . . . which was at a strip mall next to his office at the same time . . . when the accused was supposedly visiting; and shortly thereafter, she fled the area and tried to hide from the service of process."[15] The remainder of the military judge's direct examination follows:

> MJ: To your knowledge—well, do you believe Mr. [W] was complicit in any of the misconduct described on the charge sheet in this case?
>
> LtCol K: I have no evidence that he was complicit.
>
> Q. Do you believe he has otherwise engaged in misconduct in this case?
>
> A: I have no evidence to support that—I'm not aware of any evidence.
>
> Q: Do you believe he has otherwise engaged in unethical behavior in this case?
>
> A: I have no evidence to support that—I'm not aware of any evidence.
>
> Q: Is—are you currently pursuing or contemplating any effort to report Mr. [W] to either of the state bars of which he is a member?

---

[11] *Id.* at 239.

[12] *Id.*

[13] Record at 236.

[14] *Id.*

[15] Record at 250.

A: No.

Q: Are you currently pursuing or otherwise contemplating initiating or otherwise pursuing criminal action against Mr. [W]?

A: No.

Q: To your knowledge, does any part of the government currently contemplate pursuing reporting Mr. [W] to either of the state bars of which he is a member?

A: I'm not aware of any.[16]

After LtCol K's testimony the military judge called the lead Naval Criminal Investigative Service (NCIS) agent on the case. The military judge asked similar questions of the agent. The agent testified that she was unaware of any current or planned investigation into Mr. W for obstruction of justice. She also testified that she had not seen any messages between the appellant and his counsel during her review of the appellant's seized cell phone.

Mr. W argued that his interests were inversely related to the appellant's; "The more liable I am, the less liable he is, and vice versa. . . . I feel conflicted Your Honor."[17] Mr. W stated that the conflict between the appellant and his own interests were similar to one created by dual representation: "I view myself as the other client in this scenario. So could I represent myself? . . . I would ask myself as an attorney, could I represent . . . the lead civilian counsel on this matter and the client, Staff Sergeant Watkins, if I was hired by both parties?"[18]

Following argument, the military judge asked the appellant who he wanted to represent him. The appellant said that he wanted to be represented by his two detailed counsel and "another attorney that I would like to bring onboard."[19] The military judge pointed out that the appellant had hired Mr. W, and asked if he had been satisfied with his services. The appellant answered that he had been, "for the most part."[20] The military judge asked

---

[16] Record at 250.

[17] Record at 264.

[18] *Id.*

[19] Record at 267.

[20] *Id.*

the appellant if it was his wish to continue to be represented by Mr. W. The appellant answered, "No, sir, it is not."[21]

The military judge asked the appellant why he did not want Mr. W to represent him. The appellant stated that he first thought about the possibility that Mr. W might be conflicted when the government investigator brought up the fact that the appellant's wife had visited the book store next to Mr. W's office. The appellant thought that Mr. W "became, in my opinion, kind of, emotional . . . the focus was no longer on me in particular at that time, and it was more on trying to clear his name. So that made me very uncomfortable."[22] Then, "when Lieutenant Colonel [K] made his—what I would consider a threat, I guess, against . . . Mr. [W], that just—for me, it solidified the fact that it was about Mr. [W] as much as it was about me."[23] The military judge asked the appellant if he was able to effectively communicate with Mr. W. The appellant said no; his communications were "overshadowed about . . . how much priority of him [sic] trying to keep his name clear. . . . I just can't sit here thinking he could have done something else, but he's not going to do it because . . . of a threat from the government."[24]

The military judge denied Mr. W's motion to withdraw. He found that no evidence tended to prove that Mr. W was complicit in any charged misconduct, and that neither LtCol K nor NCIS intended to take any action against Mr. W. He reported that he had observed the appellant and Mr. W communicating in "a manner that is cooperative and unhampered by animosity."[25] The military judge also considered the difficulties that the government had had in securing the presence of the appellant's wife and daughter. These difficulties had already delayed trial for several months. And he viewed these difficulties in the context of the evidence that the appellant had searched the internet for information on avoiding subpoenas, extradition agreements, and other matters suggesting that he did not want his family to testify. Considering these searches and the appellant's wife's lack of cooperation and significant ties to Uganda, the military judge was "unconvinced" that the appellant's wife and daughter would be available if he were to continue the case.[26]

---

[21] *Id.*

[22] Record at 268-69.

[23] *Id.* at 269.

[24] *Id.*

[25] Record at 275.

[26] *Id.*

Taking into consideration "the totality of the circumstances,"[27] he found that there was no conflict of interest between Mr. W and the appellant. Even though Mr. W had asked to withdraw, and even though the appellant "had expressed a preference to hire a new civilian counsel," the military judge found that the offered justifications were "not supported by facts on the record." He went on to find that the arguments in favor of excusing Mr. W were "opportunistic."[28] Based on these findings, the military judge denied the appellant's motion to excuse Mr. W.

The trial on the merits began the next day. Mr. W participated substantially in the trial, conducting both cross- and direct examinations of the appellant's wife and the closing argument.

*2. Analysis of the military judge's ruling on Mr. W's motion to withdraw*

The appellant claims that the military judge abused his discretion by denying Mr. W's motion to withdraw for a conflict of interest. A military judge abuses his discretion when his findings of fact are clearly erroneous, when he is incorrect about the applicable law, or when he improperly applies the law.[29]

The military judge correctly identified the Rule for Courts-Martial (R.C.M.) applicable to motions to withdraw, R.C.M. 506(c).[30] But he erred by finding that Mr. W had to demonstrate good cause to withdraw. R.C.M. 506(c) states that "[e]xcept as otherwise provided . . . defense counsel may be excused only with the express consent of the accused or by the military judge upon application for withdrawal by the defense counsel for good cause shown."[31] The plain language of the rule makes clear that the requirement for good cause applies to a defense counsel's application to withdraw when such motion is made without the consent of the accused—not when counsel has the accused's permission to withdraw. The government concedes that this was error. For reasons discussed below, however, we find that this error did not prejudice the appellant.

---

[27] *Id.*

[28] *Id.* at 276.

[29] *United States v. Roberts*, 59 M.J. 323, 326 (C.A.A.F. 2004).

[30] *See* RULE FOR COURTS-MARTIAL 506(c), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.) (MCM).

[31] *Id.*

a. Did Mr. W have a conflict of interest?

Having erroneously decided that R.C.M. 506(c) required a showing of good cause, the military judge further erred by applying the standard announced by the Supreme Court in *Cuyler v. Sullivan*[32] for determining whether a defense counsel's representation would be hampered by a conflict of interest.

In *Cuyler*, the petitioner, John Sullivan, was one of three defendants charged with murdering the same victim. Sullivan accepted representation from the same counsel as the other defendants but was tried separately. Since neither he nor his counsel brought the potential conflict of interest to the court's attention, the trial court had no opportunity to address the question of whether Sullivan's representation was hampered by a conflict of interest. On appeal, Sullivan claimed that he had received ineffective assistance of counsel because of a conflict of interest.[33] The Supreme Court held that "[i]n order to establish a violation of the Sixth Amendment, a defendant *who raised no objection at trial* must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."[34]

The *Cuyler* test is necessarily retrospective. It asks appellate courts to look back at a trial and determine from the record whether an undisclosed conflict of interest adversely affected a lawyer's representation. Here, Mr. W did disclose his perceived conflict before trial and moved to withdraw. The military judge's attempt to apply *Cuyler* prospectively makes no sense. He could not have known *before trial* whether a conflict had affected Mr. W's representation *at trial*. Where counsel objects to a conflict of interest before trial, courts need not search for prejudice.[35] If Mr. W had had a conflict of interest with the appellant, excusal would have been the only appropriate remedy.

We find, however, that the appellant was not prejudiced by the erroneous application of *Cuyler* because Mr. W did not have a conflict of interest with the appellant. The professional responsibilities of attorneys practicing before military courts in the Department of the Navy are governed by JAGINST

---

[32] 446 U.S. 335 (1980).

[33] *Id.* at 337-41.

[34] *Id.* at 348 (emphasis added).

[35] *Holloway v. Arkansas*, 435 U.S. 475, 490 (1978) ("A rule requiring a defendant to show that a conflict of interests—which he and his counsel tried to avoid by timely objections to the joint representation—prejudiced him in some specific fashion would not be susceptible of intelligent, even-handed application."); *see also Commonwealth v. Duffy*, 394 A.2d 965, 967 (Pa. 1978) ("If a conflict of interest, i.e., a conflict between counsel's and his client's interests, is here established, we believe relief must be granted without regard to a showing of harm.").

5803.1E.[36] Regarding conflicts of interest, Rule 1.7 of this instruction forbids covered attorneys from representing a client if there is a significant risk that the representation will be materially limited by a personal interest of the attorney. Comment 4 to the rule further explains that the critical questions are the likelihood that a difference in interests will eventuate and, if it does, whether it will materially interfere with the attorney's independent professional judgment.

The military judge correctly identified this rule as pertinent to the first half of the *Cuyler* test, found the necessary facts, and applied the facts to the rule. He heard evidence about LtCol K's angry off-the-record exchange with Mr. W and found that he had in fact made the statements described above. But the military judge accepted LtCol K's later testimony that he had no evidence that Mr. W had committed misconduct, and no plans to pursue any legal or professional sanctions against him. The military judge similarly accepted the testimony of the lead NCIS agent that she had no evidence that Mr. W had committed a crime, and that she had no plan to investigate Mr. W. Although this contradicted the Regional Trial Counsel's ill-considered off-the-record words, we review the military judge's findings under the deferential clearly-erroneous standard. The testimony provides some support for the military judge's findings of fact, and we will not disturb them.

Having accepting the military judge's finding that Mr. W was not suspected of participating in any misconduct and not the subject of any government investigation, we are left to conclude that Mr. W did not have any conflict of interest that should have precluded his representation of the appellant. We have considered his statements made during the Article 39(a) session held to address the conflict issue, and given them their appropriate weight. We recognize that statements of counsel concerning potential conflicts are "virtually made under oath" and are entitled to deference.[37] But while Mr. W was emphatic about his subjective sense that the representation involved a conflict, he was, after having been given many opportunities, unable to articulate a course of action that was foreclosed to the appellant by virtue of his representation. We find that Mr. W's subjective sense of conflict does not by itself create a conflict of interest that should have precluded his participation in this case.[38]

---

[36] Judge Advocate General Instruction 5803.1E (20 Jan 2015).

[37] *Holloway* at 486 (quoting *State v. Brazile*, 75 So.2d, 856, 861 (La. 1954)).

[38] *Cf Tueros v. Greiner*, 343 F.3d 587, 597 (2d Cir. 2003) (determination of whether a conflict of interest exists turns on analysis of "actual duties" rather than an attorney's subjective sense of conflict) (per Sotomayor, J.).

In view of the military judge's findings of fact and our application of those facts to the correct law, we find that the military judge's legal errors did not prejudice the appellant and that the military judge's conclusion that Mr. W's representation was not hindered by a conflict of interest was correct.

### b. Choice of counsel

Even if the military judge correctly found that no conflict existed between the appellant and Mr. W, we must still determine whether the military judge's ruling erroneously deprived the appellant of his right to be represented by counsel of his choice.

A criminal defendant has a constitutional right, within limits, to be represented by counsel of his or her choice.[39] The right to counsel of choice also includes the right of a defendant to fire his retained counsel for any reason or for no reason.[40] The right is circumscribed, however, in several respects. A defendant's choice of counsel can be overcome by other conflicting interests, including a trial court's interest in reasonably managing its calendar.[41] We review a military judge's decision to deny an accused's request to be represented by counsel of his or her choice for an abuse of discretion.[42]

The appellant stated both that he did not want to be represented by Mr. W and that he wished to be represented by a different civilian counsel. Of course, the military judge could have granted the appellant's request to release Mr. W and denied his request to obtain new civilian counsel. The military judge, however, treated the appellant's desires regarding counsel as a request for a continuance to substitute one retained counsel for another. The appellant, both at trial and now on appeal, seems to agree with the military judge's unspoken framing of the issue. As a result, both parties agree that the military judge's decision to deny the appellant's request should be considered using the factors set forth by the Court of Appeals for the Armed Forces (CAAF) in *United States v. Miller*.[43]

In *Miller*, the CAAF articulated twelve factors relevant to a military judge's consideration of a continuance request. Those factors include "sur-

---

[39] *Wheat v. United States*, 486 U.S. 153, 159 (1988).

[40] *United States v. Rivera-Corona*, 618 F.3d 976, 980 (9th Cir. 2010).

[41] *United States v. Gonzalez-Lopez*, 548 U.S. 140, 152 ("We have recognized a trial court's wide latitude in balancing the right to counsel of choice against . . . the demands of its calendar." (citing *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983))).

[42] *United States v. Wiest*, 59 M.J. 276, 279 (C.A.A.F. 2004).

[43] *United States v. Miller*, 47 M.J. 352 (C.A.A.F. 1997).

prise, nature of any evidence involved, timeliness of the request, substitute testimony or evidence, availability of witness or evidence requested, length of continuance, prejudice to opponent, whether the moving party received prior continuances, good faith of moving party, use of reasonable diligence by moving party, possible impact on verdict, and prior notice."[44] The continuance in *Miller* had been sought to allow that appellant to obtain civilian counsel, and the *Miller* court identified five of the twelve factors as relevant to its review of the military judge's denial in that case.

While both parties agree that *Miller* applies, an actual application of the *Miller* factors to this case is not straightforward. The appellant did not explicitly ask for a continuance of any length. The military judge simply denied Mr. W's motion to withdraw. There having been no request for a continuance, the military judge did not apply the *Miller* factors on the record. Nevertheless, we have considered the denial under *Miller* and conclude that the military judge did not abuse his discretion.

We find the following *Miller* factors to be relevant:

(1) *Surprise*: The appellant claimed that he wanted new civilian counsel because LtCol K's off-the-record exchange with Mr. W, which the appellant took to be a threat, caused the appellant to believe that Mr. W should not represent him. The appellant could not have known LtCol K would threaten his civilian counsel.

(2) *Timeliness of the request*: LtCol K's angry exchange with Mr. W took place on Thursday. Mr. W moved to withdraw the following Monday, which was to have been the first day of trial. To the extent LtCol K's conduct was the inspiration for the motion, the motion was timely.

(3) *Prejudice to the opponent*: The government argued that it had already caused members and witnesses—some of whom had traveled great distances at government expense—to travel to the trial. We appreciate that this represents real cost and inconvenience to the government and that a continuance would have placed a significant burden on witnesses. Nevertheless, these do not amount to prejudice to the government's case.[45] We give this factor little weight.

---

[44] *Id.* at 358 (quoting F. Gilligan and F. Lederer, COURT MARTIAL PROCEDURE § 18-32.00 at 704 (1991).

[45] *See United States v. Fiorito*, No. 20080535, 2011 CCA Lexis 50, at 14 (A. Ct. Crim. App. 3 Mar. 2011) (unpub. op) (personal inconvenience and hardship experienced by witnesses because of delay do not constitute prejudice to the government).

(4) *Earlier continuances*: The appellant had requested only a short continuance after retaining Mr. W before the first charges were dismissed. Following referral of the second set of charges, the appellant did not request any continuances. The government had required a lengthy continuance when they were unable to produce the appellant's wife and daughter. The military judge found, however, that the appellant was at least partially responsible for the delay, citing the "context of the Google searches on the accused's phone regarding obstruction of justice, avoiding subpoenas, and the status of the extradition agreements of various countries."[46] As there is some support for this finding, we will not disturb it. And we find that the appellant's role in necessitating the earlier four-month continuance in this case can be fairly considered under this factor. We give it great weight.

(5) *Availability of witnesses*: The military judge had doubts that the appellant's wife and daughter would be available at a later time. These doubts were not unreasonable in light of the appellant's internet search history and the government's difficulty in locating and personally serving the appellant's wife. This factor favors the military judge's ruling.

(6) *Good faith of the moving party*: The military judge's ruling on the motion to withdraw turned on his determination that the appellant's request was not made in good faith. We also believe that this is the most important factor of our analysis. This factor, in turn, depends on the military judge's finding of fact concerning what motivated the appellant's request.

Even if Mr. W did not have an actual conflict of interest that prevented him from representing the appellant, a request to change counsel might still have been made in good faith. The appellant had heard the trial counsel's supervisor clash with and arguably threaten his civilian counsel. He heard his counsel argue to the military judge that he was disabled from adequately representing the appellant because his counsel's interests conflicted with his own. Mr. W even stated that if he were permitted to withdraw he would return his fee to the appellant so that he could secure new counsel. It would be unsurprising for an accused in this position to decide he wanted new counsel. These are circumstances that would tend to support a finding that the appellant's request was in good faith.

These same circumstances make this case appear similar to the CAAF's decision in *United States v. Wiest*.[47] In *Wiest*, an accused sought to fire his counsel and obtain civilian counsel after the military judge criticized his counsel's performance and questioned their competence during a pretrial ses-

---

[46] Record at 275.

[47] 59 M.J. 276 (C.A.A.F. 2004).

16

sion.[48] Writing for the court, Chief Judge Crawford (the author judge in *Miller*) applied the *Miller* factors and found that the military judge had abused his discretion by denying the request. The CAAF found it significant that Wiest's dissatisfaction with his counsel arose from the military judge's criticism of them. Considering the factor of surprise under *Miller*, the CAAF found that the "[a]ppellant was clearly surprised by the harsh criticism of his counsel by the military judge, and this factor weighed in favor of a continuance."[49] As to timeliness, the CAAF noted that the requested civilian counsel requested the continuance as soon as he was retained, only six days after the judge's criticism.[50]

In the face of these circumstances the military judge in *Wiest* erred by taking an "inelastic" approach to that appellant's request for a continuance.[51] The CAAF noted that "[i]t should therefore be an unusual case, balancing all the factors involved, when the judge denies an initial and timely request for a continuance in order to obtain civilian counsel, particularly after the judge has criticized appointed military counsel."[52]

Like the appellant in *Wiest*, the appellant here expressed his desire to change counsel shortly after an even more surprising event—an apparent threat directed at Mr. W by LtCol K. Likewise, the military judge's approach to a continuance in this case seems inelastic; the judge denied the motion to withdraw without even learning how long the proposed continuance was to have been. If the appellant's request for new counsel were in fact a good-faith request to change civilian counsel resulting from LtCol K's exchange with Mr. W, we would find that the military judge's denial of the request was an abuse of his discretion under *Wiest*.

Rather than finding that the request had been made in good faith, however, the military judge found that the request was "opportunistic"[53] and "an obvious attempt to further impede the prosecution of the case against him."[54] The military judge did not elaborate on this point but, taking his ruling as a whole, we understand this finding to mean that the appellant saw LtCol K's loss of composure as an opportunity to stall the trial in the hope that his wife

---

[48] *Id.* at 277-78.

[49] *Id.* at 279.

[50] *Id.* at 278.

[51] *Id.*

[52] *Id.*

[53] Record at 276.

[54] AE LXVI at 10.

and daughter would not appear at a later date. The military judge's conclusion that the appellant's request was motivated by opportunism rather than LtCol K's conduct is a finding of fact. Although the record contains contradictory evidence on this point, we review the military judge's findings of fact for clear error. There is some circumstantial support for this finding in the record. The appellant's internet search history revealed that he did not want his wife and daughter to show up for trial. He seemed to be interested in having them go to a country from which they could not be made to attend his trial. The appellant's wife and daughter had stopped cooperating with the government and had become difficult to find. Based upon the record, we find that the military judge's finding that the appellant's request was motivated by his desire to stall his trial was not clearly erroneous.

The military judge's finding that the appellant's request to change counsel was an opportunistic attempt to stall his trial distinguishes this case from *Wiest*. In our judgment, the finding of bad faith swamps the rest of the *Miller* factors and is the most significant factor in our conclusion that the military judge did not abuse his discretion by denying Mr. W's motion to withdraw.

## B. Hearsay

The appellant argues that the military judge erred by admitting a video recording of CKW's forensic interview under the residual hearsay rule. We disagree.

### 1. Facts related to the forensic interview

The day after the appellant allegedly assaulted his daughter, CKW, a social worker from Child Protective Services came to the family's home and talked to CKW for "five to ten minutes."[55] Three days later CKW participated in a forensic interview conducted by Ms. CM.

Ms. CM testified for the government, laying the foundation for the admission of CKW's forensic interview. Ms. CM testified to her substantial training and experience with conducting forensic interviews. She described her methods and discussed the desirability of asking non-leading questions. The techniques she described in her testimony are reflected in the recorded interview.

Although Ms. CM sought to use non-leading questions and nudge the conversation to relevant topics, CKW was not inclined to talk about the allegations she had first made four nights earlier. Ultimately, after over 20 minutes of unsuccessfully approaching the topic obliquely, Ms. CM asked more directly about the alleged abuse. CKW's demeanor changed abruptly.

---

[55] Record at 531.

CKW knew that her allegations had created problems for her family. As of the forensic interview, she knew that "they might take our money away,"[56] and that her father's retirement was in jeopardy. She knew that she and her family "may never be able to see Daddy again;" that her mother "might have to be a single mother;" and that these things made her feel "not very good."[57] She said that her sister missed her father, and she knew that her father might have to be incarcerated.

In spite of her trepidation, CKW admitted that her father had touched her "breasts" and "sexual areas."[58] She poignantly described having her father apologize to her for touching her, and how once she had told her father to have "self-control."[59] She said her father had coached her to stop him from touching her because he didn't want to touch her, but "he just did."[60]

The appellant objected to the admission of the forensic interview, and the judge overruled the objection, admitting it under the residual exception to hearsay.

### 2. The residual hearsay exception

Even when an out-of-court statement fails to qualify for one of the specific exceptions to the general prohibition against hearsay, it may nevertheless be admitted if it satisfies the residual exception found in MIL. R. EVID. 807. That rule provides for the admission of out-of-court statements for which the proponent provides notice before trial and four criteria are met:

> (1) the statement has equivalent [to other hearsay exceptions] circumstantial guarantees of trustworthiness;

> (2) it is offered as evidence of a material fact;

> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

> (4) admitting it will best serve the purposes of these rules and the interests of justice.[61]

---

[56] AE V at 19:09.

[57] *Id.* at 20:18.

[58] *Id.* at 26:50.

[59] *Id.* at 33:00.

[60] *Id.* at 36:20.

[61] MIL. R. EVID. 807(a)(1)-(4).

We review a military judge's decision to admit evidence for an abuse of discretion.[62]

The military judge made essential findings of fact and conclusions of law supporting his decision to admit the forensic interview addressing these criteria.[63]

### a. Circumstances guaranteeing trustworthiness

The military judge found that CKW's statement had equivalent guarantees of trustworthiness. In deciding this factor he considered several subfactors, including CKW's mental state, the statement's spontaneity, whether the statement was elicited by suggestive methods, the degree to which the statement is corroborated, CKW's age, and the circumstances under which the statement was made.[64]

The military judge found that CKW's state of mind supported admission. He found, based on her expressed concerns about what was happening to her family, that CKW believed that implicating her father in sexual abuse was against her interests. This finding is well supported in the record and particularly by our own observation of the forensic interview. It is clear to us that CKW was not anxious to tell the forensic interviewer that her father had touched her inappropriately. The appellant argues that this finding does not concern CKW's mental state and, even if it did, the military judge failed to reconcile the finding with CKW's testimony that she made up the accusation after she caught her father looking at pornography so her parents would have to talk to each other. We disagree with these arguments. We think that the military judge appropriately considered CKW's motivation to not disclose her father's sexual abuse when considering this factor. And we also find, as the military judge (and the members) implicitly found, that CKW's nonsensical story about her purported motive to fabricate her abuse allegation is properly dismissed as implausible.

CKW's out-of-court statements in the forensic interview were not spontaneous. They were elicited by the interviewer's questions. But Ms. CM was an experienced interviewer, having conducted over 3,000 forensic interviews. And, while she did not elicit spontaneous statements about the alleged abuse, her questions were as open-ended as possible given CKW's obvious reluctance

---

[62] *United States v. Czachorowski*, 66 M.J. 432, 434 (C.A.A.F. 2008).

[63] AE LXVIII.

[64] *See United States v. Donaldson*, 58 M.J. 477, 488 (C.A.A.F. 2003).

to discuss them at all. Ms. CM's questions did not suggest that either an accusation or a denial was the desired answer.

Overall, we find that the military judge's finding—that the out-of-court statement has guarantees of trustworthiness equal to those found in the enumerated hearsay exceptions—to be well-founded.

### b. The evidence is offered as proof of a material fact

This factor is not reasonably in dispute. CKW's statement concerned, in relevant part, the appellant's sexual abuse of her as charged by the government.

### c. The evidence is more probative on the point for which it is offered than any other evidence the government could reasonably obtain

CKW was available to—and did—testify at the appellant's court-martial. Nevertheless, the military judge found her forensic interview to be more probative on the point for which it was offered than her in-court testimony. Arguably, CKW's in-court denial that the appellant sexually abused her is more probative on the general question of whether she was sexually abused than her unsworn, out-of-court statements. In *Mitchell v. Hoke*, the prosecution introduced a witness's out-of-court identification of the defendant as a participant in a robbery.[65] The witness was available to testify, but would have recanted his out-of-court identification on the stand.[66] The Court of Appeals for the Second Circuit held that the witness's out-of-court identification "can hardly be said to be of 'high probative value' in light of his later denial of Mitchell's participation in the robbery."[67] But the CAAF has held that in the context of witness recantations, out-of-court statements can be the most probative evidence available to the proponent seeking to prove the truth of the prior statement.[68] Under this view, we agree with the military judge that the forensic interview was the most probative evidence available to the government to show the truth of CKW's prior statement—that the appellant sexually abused her.

---

[65] *See Mitchell v. Hoke*, 930 F.2d 1, 1-2 (2d Cir. 1991).

[66] *Id.* at 3.

[67] *Id.*

[68] *See e.g. United States v. Pollard*, 38 M.J. 41, 49 (C.A.A.F. 1993); *United States v. Hyder*, 47 M.J. 46 (C.A.A.F. 1997) (allowing prior statement of a recanting witness under the residual hearsay exception).

d. Admitting the interview best serves the purposes of the rules and the interests of justice

The military judge found that the purpose of the rules and the interests of justice were best served by admission of the forensic interview. Relying on the appellant's internet search history, the military judge found that the accused had been attempting to subvert justice and that CKW's recantation was the product of her mother and father's influence. He found that precluding the statements would amount to an unjust windfall to the appellant. We also think that the interests of justice are served by admitting the evidence where the appellant had violated his military protective order many times and had taken an interest in preventing CKW's testimony from ever occurring.

The military judge applied the correct law and his findings of law and fact are adequately supported. We find that he did not abuse his discretion by admitting CKW's forensic interview under MIL. R. EVID. 807.

## C. Factual Sufficiency of Conviction for Committing a Lewd Act Upon a Child

The appellant claims that his conviction for sexually abusing CKW (Additional Charge I, Specification 2) is factually insufficient. We disagree.

We review the factual sufficiency of evidence *de novo*.[69] We determine the factual sufficiency of a conviction by asking whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of an appellant's guilt beyond a reasonable doubt.[70] This means conducting "a fresh, impartial look at the evidence, giving no deference to the decision of the trial court on factual sufficiency beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses."[71]

We are persuaded beyond a reasonable doubt that the appellant sexually abused CKW. First, CKW's forensic interview is compelling. As discussed above, CKW seemed reluctant to admit that she had been sexually abused by her father. She knew her father was at risk of incarceration and the loss of his retirement and, in the absence of her father and his financial support, her mother would have to support herself and the family on her own. She per-

---

[69] *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[70] *United States v. Turner*, 25 M.J. 324, 326 (C.M.A. 1987).

[71] *Washington*, 57 M.J. at 399.

ceived her allegations to be against her and her family's interests. This makes them credible.

The appellant asks us to accept as reasonable CKW's later claim that she fabricated the allegation because she found her father looking at pornography. In this account, CKW was angry with her father for looking at pornography, and afraid her parents would get a divorce. In her mind, if she told her mother that her father had sexually abused her, "[her] mom and dad would talk out whatever happened and everything would be okay again."[72] This account makes no sense, even to a nine-year-old child. The members rejected this explanation, as do we.

CKW's allegations in the forensic interview were corroborated by evidence tending to show the appellant's consciousness of guilt. A search of the appellant's car at the time of his apprehension revealed three books on the topic of caring for sexually abused children, including the titles *Caring for Sexually Abused Children*; *Helping Your Children Recover from Sexual Abuse*; and *How Long Does it Hurt?* The appellant's actions at the time of the offense are even more incriminating. After CKW told the appellant's wife that the appellant had abused her, the appellant's wife started to cry and the appellant left the house. The appellant threatened suicide and made a suicidal gesture by putting his wife's prescription pain medicine in his mouth. He sent farewell texts to his wife apologizing, telling her the family is better off without him, praying that God would forgive him, and that he deserved death. The appellant argued that he was a devout Baptist, and that he was reacting to having been caught looking at pornography on the computer. We find this explanation implausible. We are personally convinced of appellant's guilt beyond a reasonable doubt.

**D. The Members' Instructions On Obstruction of Justice and Related Claim of Ineffective Assistance of Counsel**

The appellant was convicted of obstructing justice, an offense delineated by the President in the Manual for Courts-Martial as a violation of Article 134, UCMJ.[73] Specifically, the members found that he endeavored to impede trial on his initial charges by wrongfully tampering with CKW. The appellant now claims that the military judge committed plain error by failing to provide the members with accurate instructions on this offense. Specifically, the appellant claims that the military judge's definition of *tamper* was so broad that it exposed the appellant to liability for uncharged offenses. We disagree.

---

[72] Record at 652.

[73] Part IV, ¶96, MCM.

Whether the military judge properly instructed the members is a question of law we review *de novo*. Military judges must give instructions that provide necessary guideposts for informed deliberation on the guilt or innocence of the accused.[74] When, as here, an appellant fails to object to an instruction at trial, we review the instruction for plain error.[75] Plain error requires an appellant to demonstrate that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused.[76]

The military judge instructed the members that to convict the appellant of obstruction, the government needed to prove four elements: first, that the appellant wrongfully did a certain act—specifically that he tampered with CKW; second, the tampering pertained to his own legal case while he had reason to believe that there were or would be criminal proceedings pending; third, that the acts were done with the intent to impede a trial by court-martial or influence the testimony of CKW; and fourth, that the conduct was to the prejudice of the armed forces and of a nature to bring discredit upon the armed forces. These instructions correctly set forth the elements of the offense as alleged in the specification.

At trial counsel's suggestion, the military judge defined *tamper* by borrowing from the definition found in 18 U.S.C. §1512 (2016), which proscribes tampering with witnesses and evidence. Because this section covers tampering with both witnesses and evidence, the members heard an expansive and repetitive definition:

> The term "tamper" means that the evidence supports a finding that the accused knowingly used intimidation, threatened or corruptly persuaded C.K.W., or attempted to do so, or engaged in misleading conduct towards another person with the intent to influence, delay, or prevent the testimony of C.K.W. in an official proceeding; cause or induce C.K.W. to withhold testimony or withhold a record, document, or other object from an official proceeding; alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding; evade legal process summoning

---

[74] *United States v. Killion*, 75 M.J. 209, 211 (C.A.A.F. 2016).

[75] *United States v. Payne*, 73 M.J. 19, 22-23 (C.A.A.F. 2014).

[76] *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011) (holding that where an erroneous instruction implicated a constitutional issue and where the error was obvious, the appellant must also suffer prejudice to a substantial right in order to prevail).

that person to appear as a witness, or to produce a record, document, or other object in an official proceeding; be absent from an official proceeding to which such person has been summoned by legal process; or hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings.

The term "tamper" may also mean that the accused corruptly altered, destroyed, mutilated, or concealed a record, document, or other object, or attempted to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or otherwise obstructed, influenced, or impeded any official proceeding, or attempted to do so.[77]

The appellant claims that this expansive definition was erroneous because it includes elements from three separate federal criminal offenses, and that this exposed the appellant to liability for offenses of which he had no notice. In particular, the appellant complains that the instruction exposed him to conviction for destroying or altering evidence, obstructing a proceeding, or misleading someone other than CKW. The appellant also claims that the definition permitted the members to convict the appellant for ordinary, innocent conduct that might have had the effect of delaying the proceeding or altering CKW's testimony.[78]

We find no plain error. We agree that the definition of *tamper* used by the military judge encompassed a broader range of conduct than that which the government alleged in the specification and proved at trial. But the use of broad definitions in the context of explaining a specification to members is not uncommon. Here, the specification and the military judge's description of the elements sufficiently narrowed the scope of conduct for which the members could have convicted the appellant.

The appellant also claims that this definition of *tamper* created a risk that the members convicted the appellant for innocent conduct.[79] Again, we find

---

[77] Record at 757-58.

[78] *See Arthur Anderson LLP v. United States*, 544 U.S. 696 (2005).

[79] *See United States v. Fosler*, 70 M.J. 225, 230-231 (C.A.A.F. 2001) ("'Wrongfully' is a word of criminality and, though our case law has been at times unclear, words of criminality speak to mens rea and the lack of a defense or justification.") (internal citation omitted).

no plain error. The members were instructed that the appellant's act had to be wrongful, a term that ordinarily protects an accused from liability for innocent conduct. Taken as a whole, the instructions provided sufficient guideposts to the members' deliberations. While the military judge's definition of *tamper* might have been more narrowly tailored to the appellant's alleged conduct, we do not find it to be erroneous in the context of the other instructions pertaining to this specification.

In addition to claiming that the military judge committed plain error in his instructions, the appellant argues that his counsel were ineffective by failing to object to them. As we have found that the instructions were not erroneous, we similarly find that the appellant's counsel were not ineffective for not objecting to them.

## E. Legal and Factual Sufficiency of the Appellant's Conviction for Obstructing Justice

The appellant argues that that his conviction for obstruction of justice is legally and factually insufficient because the government adduced no evidence that he wrongfully tampered with CKW. We review questions of legal and factual sufficiency *de novo*.[80] The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact finder could have found all the essential elements beyond a reasonable doubt."[81] In weighing questions of legal sufficiency, the court is "bound to draw every reasonable inference from the evidence of record in favor of the prosecution."[82] The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses" we are "convinced of the accused's guilt beyond a reasonable doubt."[83]

The elements of obstructing justice are as follows:

(1) That the accused wrongfully did a certain act;

(2) That the accused did so in the case of a certain person against whom the accused had reason to believe there were or would be criminal proceedings pending;

---

[80] *Washington*, 57 M.J. at 399.

[81] *United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citations omitted).

[82] *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

[83] *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

(3) That the act was done with the intent to influence, impede, or otherwise obstruct the due administration of justice; and

(4) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.[84]

The appellant's web searches, which included "dodging being served a subpoena," prove that he was motivated to prevent members of his family from testifying at his court-martial. Knowing that the government was attempting to serve his wife with a subpoena, he researched the hotel where his family hid from government agents attempting to serve the subpoena. The appellant even violated his military protective order by visiting them in their hiding place shortly before his scheduled court-martial.

This is strong circumstantial evidence that the appellant wrongfully did a certain act, specifically that he tampered with CKW as that term was explained by the military judge. The timing of these web searches and acts makes it clear he did these acts in order to obstruct his own court-martial, which he knew was scheduled to take place within days of these acts. And we are convinced that this conduct was prejudicial to good order and discipline in the armed forces and was of a nature to bring discredit upon the armed forces.

We find that a reasonable trier of fact could have found that the government proved every element of this offense beyond a reasonable doubt. And, having considered the record for ourselves, we are also convinced of the appellant's guilt beyond a reasonable doubt.

## F. Error in the Convening Authority's Action

The appellant contends, and the government concedes, that the convening authority's action is erroneous because it fails to reflect the members' exceptions in their findings as to the sole specification under Additional Charge III. We agree, and we direct corrective action in our decretal paragraph.

## III. CONCLUSION

The supplemental promulgating order shall reflect that the members acquitted the appellant of the language "influence the testimony of C.K.W." Following our corrective action, we find that no error materially prejudicial to

---

[84] *See* Part IV, ¶96.b., MCM.

the substantial rights of the appellant remains. Arts. 59(a) and 66(c), UCMJ. Accordingly, the findings and the sentence are **AFFIRMED**.

Chief Judge WOODARD and Judge CRISFIELD concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court